**In the Matter of the WELFARE OF E. G. and K. B.**

**No. 48707.**

Supreme Court of Minnesota.

June 23, 1978.

Gary Flakne, County Atty., Deonne Parker, Asst. County Atty., Minneapolis, for Hennepin County Welfare Department.

Jacqueline Huber, Law Offices of Legal Aid Society, Minneapolis, for natural mother.

Minnesota Chippewa Tribe, Bernard P. Becker, St. Paul, for amicus curiae seeking reversal.

Robert Oliphant, Minneapolis, for intervenors, foster parents.

Michael Freeman, Minneapolis, for E. G.

Barbara Kehrberg, Asst. Public Defender, Minneapolis, for K. B.

Heard before SHERAN, C. J., YETKA and GODFREY, JJ., and considered and decided by the court en banc.

OTIS H. GODFREY, Jr., Justice.*

This case is before the court on a petition for a writ of prohibition. It involves the welfare of two minor children who were adjudicated neglected and placed in the legal custody of the Hennepin County Welfare Department in 1968. One of the children, E. G., at age 45 days, was placed with respondents as foster parents, and they have cared for him continuously for almost 10 years. The natural mother now seeks clarification of her visitation rights and the ultimate return of her child. Upon motion, the juvenile court permitted the foster parents to intervene. The natural mother and the welfare department ask this court to prohibit that order from taking effect.

The purpose of the Juvenile Court Act is clearly stated in Minn.St. 260.011, subd. 2:

"The purpose of the laws relating to juvenile courts is to secure for each minor under the jurisdiction of the court the care and guidance, preferably in his own home, as will serve the spiritual, emotional, mental, and physical welfare of the minor and the best interests of the state; to preserve and strengthen the minor's family ties whenever possible, removing him from the custody of his parents only when his welfare or safety and protection of the public cannot be adequately safeguarded without removal; and, when the minor is removed from his own family, to secure for him custody, care and discipline as nearly as possible equivalent to that which should have been given by his parents. The laws relating to juvenile courts shall be liberally construed to carry out these purposes."

■ The natural home, as noted in the statute, is the preferred place for any child.

Even when the child has been adjudged neglected and removed from his home, his ultimate return to his natural family should continue to be the goal sought. The test to be applied in any individual case, however, is what is in the best interests of the child.

The foster parents seek to intervene because they feel it would be in the best interests of the minor if they are permitted to do so. Since they have had physical custody of E. G. for virtually his entire life, it is apparent that the foster parents could offer material evidence concerning the spiritual, emotional, mental, and physical wellbeing of the minor child.

■ The issue before the court, however, is whether the juvenile court may permit nonadopting foster parents to intervene as parties in a neglect hearing. Minn.St. 260.-155, subd. 1, provides in part that "[t]he court shall exclude the general public from these hearings and shall admit only those persons who, in the discretion of the court, have a direct interest in the case or in the work of the court."

Because the minor has been in the foster parents' home for almost 10 years, it is natural that a strong bond of attachment should have developed. As suggested by the trial court, the foster parents may even have become the "psychological parents" of E. G. Nevertheless, the child was placed in their home pursuant to Minn.St. 257.07, which provides:

"Every person placing a child in a foster home shall enter into a written agreement with the person taking the child, which agreement shall provide that the person placing the child shall have access at all reasonable times, to such child and to the home in which he is living, and for the return of the child by the person taking him when, in the opinion of the person placing such child or in the opinion of the commissioner of public welfare, the best interests of the child shall require it. The provisions of this section shall not apply to children who have been legally adopted."

* Acting as Justice of the Supreme Court by appointment pursuant to Minn.Const. art. 6, § 2, and Minn.St. 2.724, subd. 2.

■ The written agreement between the foster parents and the welfare department states that the foster parents "[r]ecognize that the supervising agency has the responsibility for making and carrying out the service plan for the child, which may include but not be restricted to adoption, transfer to another home, or return to parents or other relatives." One of the primary purposes of the hearing before the juvenile court is to determine if the natural mother has been adequately rehabilitated. If the court so finds, the ultimate return of the child to his family home is the intent of the statute.

This court held in *State, by St. Louis Co. v. Niemi*, 284 Minn. 225, 230, 169 N.W.2d 758, 761 (1969), that:

" * * * A foster home, important as it is, is a custodial arrangement subordinate to the stated responsibility of the state for the child and his natural family. * * *

" * * * [L]icensed foster home parents * * * have no standing to litigate the disposition of a neglected child placed in their home by the legal custodian either in habeas corpus proceedings or in proceedings in the juvenile court."

■ The deep concern and interest of the foster parents for the welfare of the minor are apparent. The statute does not contemplate, however, that hearings concerning a neglected child be conducted in an adversary atmosphere. The court has properly appointed able counsel to represent the minor. The foster parents will undoubtedly be called as witnesses, either by the minor's attorney or by the court.

■ The foster parents claim standing to participate in any hearing and rely on *Smith v. Organization of Foster Families*, 431 U.S. 816, 97 S.Ct. 2094, 53 L.Ed.2d 14 (1977). While the U.S. Supreme Court assumed a "liberty interest" of foster parents when it considered the adequacy of New York's removal procedures, the court did not find that the same constitutional right to notice and due process would exist in every foster-parent situation. We are satisfied that the statutes and procedures followed here meet any constitutional test. As pointed out in the *Smith* case—

" * * * whatever liberty interest may be argued to exist in the foster family is significantly weaker in the case of removals preceding return to the natural parent, and the balance of due process interests must accordingly be different." 431 U.S. 853, 97 S.Ct. 2111, 53 L.Ed.2d 37.

Where a child has been placed in a foster home as an infant and has remained there for almost 10 years, seeing his natural mother on only infrequent occasions, it is natural that a foster family should hold the same place in the emotional life of the foster child and fulfill the same functions as a natural family. We are sure that all the parties and counsel are aware of this psychological reality.

Nevertheless, the rights and obligations of foster parents in relation to a child placed in their home, albeit for 10 years, are circumscribed by the foster-parent placement agreement, which is not intended to create a permanent relationship between foster parents and a child. The agreement does establish the legal relationship between the welfare department and foster parents. The creation of a substantive right of nonadopting foster parents in their relationship with a child placed in their care is incompatible with § 257.07 and the clearly established and long-recognized rights of natural parents. See, e. g., *Pierce v. Society of Sisters*, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925).

The case is accordingly remanded to Hennepin County Juvenile Court for further hearings. We would urge counsel to set forth in writing the relief sought, in order to clearly define the issues before the court.

Let the writ issue.